[Cite as *In re A.B.*, 2026-Ohio-2691.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re A.B., S.B.

Court of Appeals No. {48}L-26-00019

Trial Court No. 23296032

**DECISION AND JUDGMENT**

Decided: July 14, 2026

* * * * *

Janna E. Waltz, for appellee.

Dan M. Weiss, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, J.T. ("mother"), appeals the January 30, 2026 judgment of the Lucas County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of her children, A.B. and S.B., to appellee, Lucas County Children Services ("LCCS").[1] For the following reasons, we affirm.

---

[1] M.B. ("father"), the children's father, did not appeal the trial court's decision.

## I. Background and Facts

## A. Pretrial

{¶ 2} LCCS filed a complaint alleging that A.B. was dependent and neglected. In its complaint, the agency alleged that it received a referral when A.B. was born because mother tested positive for THC at the time of delivery. It also claimed that mother was in the hospital several months earlier and tested positive for THC, cocaine, and alcohol. Mother claimed that she used substances before she knew that she was pregnant, which explained her positive tests during her first hospital visit. She also admitted to using THC while pregnant but claimed that she intended to stop using all substances. Mother denied any domestic violence between her and father. She admitted to mental health diagnoses including depression, anxiety, PTSD, and a personality disorder.

{¶ 3} Less than two weeks later, LCCS received another referral for the family because police were called to mother's home due to father "choking her out." The referral claimed that maternal grandmother took mother and A.B. to her home, but mother was drunk and attempted to take A.B. from grandmother's home. The referral also claimed that mother kept going back to father's house. Mother told the investigative caseworker that she and father were in a verbal altercation, but nothing physical happened. She claimed that she told grandmother that father choked her so grandmother would come right away. She also claimed that the bruise visible on her neck was self-inflicted. As a result of this incident, LCCS implemented an out-of-home safety plan for

2.

A.B. that had her residing with her half-sibling's mother and prevented mother and father from having unsupervised contact with her or residing with her.

{¶ 4} Five days after this referral, mother tested positive for THC.

{¶ 5} Less than two weeks after the first domestic violence referral, another domestic violence incident occurred between mother and father. Father reported that they were drinking and had an argument. He tried to remove himself from the situation, but mother followed him and tried to bite him, so he pushed her off of him. Mother reported that they were drinking and had an argument, and father tried to choke her during their fight. Police also put mother on an involuntary psychiatric hold as a result of this incident because she was drunk and threatening to harm herself.

{¶ 6} For those reasons, LCCS sought temporary custody of A.B. The magistrate granted the agency interim temporary custody, which the trial court adopted.

{¶ 7} At the adjudication and disposition hearing, the parties agreed to an adjudication of A.B. as dependent and neglected. The magistrate accepted the agreement, found A.B. dependent and neglected, and awarded LCCS temporary custody. The trial court adopted the magistrate's decision.

{¶ 8} While the case for A.B. was pending, mother gave birth to S.B. Five days after his birth, LCCS filed a complaint alleging that S.B. was dependent. In its complaint, the agency alleged that it had an open case involving A.B., mother was engaging in case plan services and providing negative urine screens, and there continued to be concerns about domestic violence and alcohol use in father's home, despite him

3.

engaging in case plan services. LCCS sought protective custody of S.B. pending adjudication, which the magistrate granted, and the trial court adopted.

{¶ 9} At the adjudication and disposition hearing for S.B.'s case, the parties agreed to a finding of dependency. The magistrate accepted the agreement, found S.B. dependent, and awarded LCCS protective supervision over S.B., who was living with mother. At the same hearing, the magistrate modified LCCS's temporary custody of A.B. to protective supervision and awarded mother legal custody of A.B. The trial court adopted the magistrate's decision.

{¶ 10} About three weeks after A.B. returned to mother's custody, LCCS filed a motion to change disposition in each case. In its motions, LCCS alleged that nine days after mother received legal custody of A.B., she left the children with a resident of her sober living facility, telling the resident that she was going to the store and would return shortly. Mother then left the facility with another resident and went to a bar, where she consumed a "'few shots.'" After about three hours, mother returned to the sober living facility. She then took the children, put them in the car with the resident she had been drinking with, and left the facility. When mother returned to the facility, she was given a drug screen that came back negative for alcohol because she had not yet metabolized the shots she took at the bar. Two days later, mother was again drug tested, and the screen came back positive for alcohol. After the positive test, mother admitted to being at a bar, drinking, and putting the children in a car with the other resident who had also been drinking.

4.

{¶ 11} The magistrate held a shelter care hearing in response to LCCS's motions. At the hearing, the parties agreed to awarding LCCS interim temporary custody of the children. The magistrate approved the agreement and awarded LCCS interim temporary custody. The trial court adopted the magistrate's decision.

{¶ 12} About eight months later, LCCS moved for permanent custody of both children. In its permanent custody motions, LCCS alleged that the children could not be placed with either parent within a reasonable time or should not be placed with either parent, A.B. had been in LCCS custody for 12 months out of a consecutive 22-month period, and permanent custody was in the children's best interests. The agency claimed that (1) notwithstanding reasonable case planning and diligent efforts by the agency to assist her to remedy the problems that initially caused the children to be placed outside the home, mother had failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the home; (2) mother's chronic mental illness, emotional illness, or chemical dependency was so severe that it made her unable to provide an adequate permanent home for the children; and (3) mother had demonstrated a lack of commitment toward the children by failing to complete case plan services. The agency also argued that permanent custody was in the children's best interests because they were doing well in foster care and needed a legally secure, permanent placement.

5.

**B. Permanent custody hearing**

{¶ 13} At the permanent custody hearing, LCCS presented the testimony of LCCS caseworker, Tracey Merrithew, and the children's guardian ad litem, Michele Gregory. Mother testified in her own behalf.

**1. LCCS's case**

{¶ 14} Merrithew testified that she became the family's ongoing caseworker in January 2025. From reviewing the file, she knew that the agency became involved with the family due to concerns about physical abuse, sexual assault, domestic violence, mental health, and housing issues. The agency filed its complaint alleging that A.B. was dependent and neglected in August 2023 and was awarded interim temporary custody. When S.B. was born in October 2024, the agency filed its second complaint alleging that S.B. was dependent. S.B. stayed in mother's custody, with LCCS having protective supervision.

{¶ 15} Based on the agency's concerns, it developed a case plan for the family. The case plan required mother to undergo a dual-diagnosis assessment, attend parenting classes, participate in domestic violence services, and obtain housing.

{¶ 16} Mother completed a dual assessment at Zepf Center but did not engage in services there. Several weeks later, mother moved to Talbot for mental health and substance abuse treatment. She engaged in recommended services for several months at Talbot before she left and was unsuccessfully discharged. Next, mother received services at Aurora for about two months before she was unsuccessfully discharged for breaking

6.

the organization's rules. Mother next went to UMADAOP where she received treatment services for a year. Mother was residing in UMADAOP's sober living facility and gave birth to S.B. while she was there. S.B. lived with mother at the facility, and mother reunified with A.B. while she was there.

{¶ 17} When mother unsuccessfully left UMADAOP, she went to live with father, with whom she had had multiple domestic violence incidents. After moving in with father, mother "did not really engage" with substance abuse and mental health treatment and "ultimately [had] not done any further treatment for her substance abuse and mental health." She went back to Zepf for about a month before she stopped going to treatment. Mother submitted drug screens while attending services at Zepf, which came back positive for THC. After Zepf, mother went to Unison for services for a brief time. She "really did not" engage in services at Unison. Merrithew thought that mother "kind of toyed with the idea of wanting to do it, but then wasn't committed to doing it." At the time of the hearing, mother was not engaged in treatment. She told Merrithew that "she is tired of being in services. And at the same time doesn't want to continue to go to providers that specialize in addicts . . . . [S]he's tired of being around the addicts all the time." Over the course of the two years that mother's cases were open, she did not successfully complete any mental health or substance abuse treatment. Merrithew said that mother's "lack of consistency just shares with me that she's just not in a healthy mental state to be able to function well in the environment around her."

7.

{¶ 18} In addition to the mental health and substance abuse services mother received at various providers, she was also involved in the juvenile court's family treatment court. At the time of the hearing, she was in phase three of three and had been in that phase for over a year. She was not compliant with orders from the treatment court. Mother provided multiple urine screens while in treatment court that all came back positive for THC. She had some screens that came back positive for alcohol and cocaine as well. The level of THC in mother's urine told Merrithew that mother was using marijuana daily. As a participant in treatment court, mother was expected to refrain from using all substances, including marijuana and alcohol, which had been discussed with mother "[l]ots" of times.

{¶ 19} LCCS had concerns about mother's substance use. She had not stopped using marijuana throughout the course of the entire case. Additionally, if "she's under peer pressure, [she] will go drink."

{¶ 20} The agency also had concerns about mother's mental health. She had a long history of mental health issues, including self-harm and suicidal ideation, and Merrithew was unsure if mother had addressed those issues.

{¶ 21} Mother completed a parenting class and there were no concerns noted by the class provider. Although Merrithew admitted that "[w]hen [mother] is in the care of her children directly, . . . she's a good mom[,]" she was concerned about mother "folding to peers and others around her that causes her to make decisions that put her children at risk. And her ongoing use of marijuana is also as to that risk towards the kids."

8.

{¶ 22} Mother completed domestic violence services. Despite that, Merrithew found it "concerning that she continues to go back to [father] over and over, and over and over, and over and over, and over again knowing that there is an ongoing domestic history between the two of them." Mother moved back in with father months after completing the domestic violence programming. Through family treatment court, mother was offered assistance with finding housing, but "[s]he was kind of set in her ways of going back and being with [father]."

{¶ 23} At the time of the hearing, mother was alternating between living with her mother and living with her grandfather. She would stay with one until they kicked her out and then go live with the other. Merrithew did not consider this stable housing. Additionally, mother was not employed

{¶ 24} In January 2025—nine days after mother received custody of A.B.—there was an incident involving the children at the UMADAOP sober living facility. Mother and another resident were going to go shopping. The other resident was driving and pulled over at a bar. Although mother said that she was going to stay in the car, she eventually went into the bar and drank alcohol with the other resident. When they finished drinking, they drove back to the facility. After they returned, mother's children and the other resident's children were put into the car, and the other resident drove them away. Mother was drug tested when she returned and found to be positive for alcohol. Merrithew discussed the incident with mother, who claimed that she "couldn't do

9.

anything" to prevent the other resident from putting the children in the car and driving them while drunk. Following her discussion with mother, Merrithew

> was concerned . . . how she seemed to disconnect from the responsibility of making sure another person didn't take her children and put them in a car and drive away drunk. . . . And she just didn't seem to connect the severity of it, or if she connected the severity of it, she didn't put the severity of the risk for her children above facing the peer to say no. There seemed to be a disconnect between those two which concerned [Merrithew] for her protective capacity of both the children.

After this incident, LCCS removed the children from mother's care.

{¶ 25} The children were placed in a foster home together and were doing "[f]abulous" in their placement. They were bonded to their caregiver and to each other. Overall, the children were "doing very well in their milestones and in their social adjustment." All of their needs were being met in the foster home, and they appeared to be happy. Their foster placement was willing to adopt them. At some point, mother approached the foster caregiver to ask if the caregiver would be willing to adopt the children. The agency was unable to find any appropriate relative placements for the children. Mother was visiting the children weekly at the agency; there were no concerns with those visits.

{¶ 26} LCCS asked the court to grant it permanent custody of the children. Merrithew thought that permanent custody was in the children's best interests because the children deserved permanency. The concerns that initiated A.B.'s case had not been eliminated, and the agency continued to have concerns about substance abuse, mental health, domestic violence, and housing. Merrithew did not think that mother could complete case plan services if she were given more time.

10.

{¶ 27} On cross-examination, Merrithew said that mother had successfully completed some of her case plan services, including a parenting class and domestic violence services. There were no concerns with mother's parenting as a result of the parenting class and no concerns about her visits with the children. Mother and the children were bonded and she did well with them. Although mother "opened the door for herself to be involved with any domestic violence with [father] when she moved back in with him[,]" Merrithew did not know of any police reports or 911 calls indicating that there had been further domestic violence between mother and father.

{¶ 28} Merrithew admitted that the "biggest issue" in this case was mother's continued use of marijuana. The last drug screen that was positive for alcohol happened about 11 months before the final hearing, but Merrithew knew of a time several months before the hearing when mother and father were drinking together and mother returned to her service provider drunk. Mother was driving when they returned to the service provider. This showed Merrithew that mother's alcohol use was also an ongoing issue in the case. Mother's alcohol use had placed the children in danger because it had led her to put the children in a car with a drunk driver. Mother had been in treatment throughout most of the two-year-long case.

{¶ 29} Merrithew had not visited mother's home because mother did not have one; she was staying with her mother and grandfather.

{¶ 30} To support herself, mother would often post online asking people to send her money.

11.

{¶ 31} Gregory, the children's GAL, testified that she investigated the case. Based on the information that she learned, she believed that it was in the children's best interests for LCCS to receive permanent custody.

{¶ 32} According to Gregory, mother had improved in her ability to parent after taking parenting classes. However, Gregory had concerns about mother's ability to parent the children. First, there were issues with mother's drug and alcohol usage. Although mother had not tested positive for cocaine recently, "she keeps herself in the lifestyle and continues to associate with people who do" use cocaine. There was also the issue of mother "seem[ing] to place others' opinions, friends' opinions, peers' opinions above what she needs to be doing to protect her children[,]" as evidenced by the situation at UMADAOP when she allowed someone drunk to drive her children.

{¶ 33} Gregory did not think that mother could make enough progress to reunify with the children even if she were given more time because

> once she gets out of that service she goes right back to the same patterns of use, the same people who are very negative and un-supportive, to using THC, to drinking, to living in a lifestyle that is not conducive to appropriately caring for her children. She has no way of supporting them, no way of seeing things through. I think she truly wants to, but I don't think she can because of the trauma from her youth. And recent trauma has so blocked her ability to mature and get through it. It's going to take a long time and intense therapy to get through. And she's had two years and she's made no progress.

{¶ 34} Gregory said that the children were doing "magnificent" in their placement and seemed happy. A.B. was bonded with S.B., and both children seemed bonded with their caregiver. All of their needs were being met. Their caregiver was willing to adopt them.

12.

## 2. Mother's testimony

{¶ 35} Mother testified that she was living with her grandfather and had been there for four or five months.

{¶ 36} Mother recalled that the case with LCCS started because of domestic violence with father. The agency also listed mental health, substance abuse, and housing as concerns.

{¶ 37} Mother began her mental health and substance abuse treatment at Talbot. She was initially in a three-month residential program, which she successfully completed. She later returned to treatment at Talbot but did not successfully complete her program because she "overthought it, and [she] left. [She] just up and left." Between her two stints with Talbot, mother received treatment with Aurora. She left that program when staff tried to take a cellphone that she had sneaked into the facility. She claimed that she had the phone to check on her sister, who "was going through some issues[.]" After her second time at Talbot, mother went to UMADAOP. She was there for almost a year but did not successfully complete the program. She explained that she left UMADAOP because her "children got removed from [her] again, and [she] got extremely depressed."

{¶ 38} Mother explained the incident that led to the children being removed by LCCS. She said that she was going to the store with another resident, who told her that someone who worked at the UMADAOP facility was working at a bar that night, so they decided to visit this person at the bar. Mother initially decided to wait in the car because she has "a problem sometimes being easily influenced." Ultimately, mother went into the

13.

bar and decided to drink with the other resident. She had two or three shots. When they got back to the facility, the other resident got the children to put them in the car so that she and mother could go to someone's house to continue drinking. Mother told the resident that she did not want to do that and was not going anywhere. Despite that, the other resident went outside with the children and put them in the car. When the resident got in the driver's seat, mother started to take the children out of the car, but the resident started to pull away, so mother jumped in the car with her. Mother was arguing with the resident and screaming at her to turn around or mother would call the police. The resident went back to the facility, and mother took the children back into the facility.

{¶ 39} After LCCS removed the children again, mother left UMADAOP and went to live with father. Initially, she was not in treatment while she was living with father, but she eventually went to Zepf for treatment. She did not successfully complete the program at Zepf. Although she was in its sober living facility, she chose to leave because she "did not like being in sober living that much. A lot of people in there [she had] noticed are still using, and [she] did not want to be around that." Mother did not go back to treatment after this and had been out of treatment for about three months at the time of the hearing. She said that she was not in treatment because she "went into a little hole. [She] isolated from everybody for a good while."

{¶ 40} Mother admitted that she was still using marijuana but claimed that "realistically [she] can stop." She said that she would not continue to use marijuana every day if the children came back to her home. Mother had been participating in

14.

family treatment court since about a month after LCCS opened its case with A.B. and she knew that she was not supposed to be using any substances while engaged with treatment court. Despite that, she continued to use marijuana because "I don't really like medication too well. I usually get sick off of it . . . . Medication does not sit well in my stomach. So marijuana usually is very good to help me with my anxiety and stuff. It keeps like, calms me down a little bit. So that's usually what I use it for if I'm stressed out."

{¶ 41} When counsel asked what mother thought was in the best interests of the children, she responded, "[p]ersonally, I would love for my babies to come home. They are—they're the reason I get up in the morning, the reason I'm still trying, you know." She also told the court that

> whatever decision happens today, I am okay with as long as I know my children are okay. Like, if they're—they're my lifeline. I love them more than anything in this world. And I have made a lot of mistakes over this case, but one thing I never did was give up on them. That is one thing I would never do. I just hope that you see that I might have some issues, but I'm just 22 years old. I'm a brand new mother, and I'm willing to fix any damn issues . . . . Any issues to make sure that they come home with me.

{¶ 42} On cross, mother said that she stopped going to treatment because "I have a problem with self-sabotaging myself, and I thought that I was doing it for nothing. I thought everyone was against me on the case."

{¶ 43} Regarding her marijuana use, mother said that she did not have an excuse for not quitting over the course of the case and she "probably should have to help better [her] case for this case." She had not already stopped using because she was not sure if the children were coming back to her.

15.

{¶ 44} Mother said that she had been working on addressing the trauma in her life in therapy but had not been able to do a more intense therapy because she had to be substance-free for at least a year before the therapist would attempt it. Merrithew and Gregory had encouraged mother to reengage in therapy, but mother had not done so.

### C. Trial court's decision

{¶ 45} After taking the matter under advisement, the trial court granted LCCS's motion for permanent custody. The court found that permanent custody was appropriate because R.C. 2151.414(E)(1), (2), and (4) applied to mother. The court also found that LCCS had made reasonable efforts to reunify the family.

{¶ 46} In its judgment entry, the trial court found clear and convincing evidence that the children could not be placed with the parents within a reasonable time and should not be placed with the parents and that awarding permanent custody to LCCS was in the children's best interests.

{¶ 47} The court found under R.C. 2151.414(B)(1)(a) that the children could not be placed with either parent within a reasonable time and should not be placed with either parent.

{¶ 48} In determining that the children could not or should not be placed with mother, the court made findings under R.C. 2151.414(E)(1), (2), and (4). Under (E)(1), the court found that mother continuously and repeatedly failed to substantially remedy the conditions that caused the children to be placed outside of the home, despite reasonable case planning and diligent efforts by LCCS. Although mother participated in

16.

case plan services, she failed to complete substance abuse services and maintain sobriety. She used alcohol and cocaine after leaving a sober living facility and continued to test positive for marijuana, despite being told that her use was a barrier to reunification. She was linked with a mental health services provider but was not actively participating in services at the time of the hearing.

{¶ 49} Under (E)(2), the court found that mother suffers from such severe chemical dependency that she is unable to provide an adequate permanent home for the children and was unlikely to remedy her chemical dependency within one year of trial. Mother failed to engage in and successfully complete substance abuse services. Although mother had sought treatment from multiple providers, she had not been able to demonstrate an extended period of sobriety, as evidenced by her relapse less than two weeks after reunifying with the children.

{¶ 50} Under (E)(4), the court found that mother demonstrated a lack of commitment to the children by other actions showing an unwillingness to provide an adequate permanent home. Mother failed to successfully complete case plan services and demonstrate the necessary lifestyle changes required to reunify with the children.

{¶ 51} Based on these factors, the court determined that LCCS presented clear and convincing evidence that the children had not been abandoned or orphaned, had not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and could not be placed with either parent within a reasonable time or should not be placed with either parent.

17.

{¶ 52} Additionally, the court found by clear and convincing evidence under R.C. 2151.414(B)(1)(d) that A.B. had been in the custody of LCCS for 12 or more months of a consecutive 22-month period. A.B. was in LCCS's custody from October 30, 2023, to January 8, 2025, and returned to LCCS's custody on May 1, 2025. The agency filed its motion for permanent custody on August 20, 2025, at which point A.B. had been in its custody for over 17 months.

{¶ 53} Finally, the court determined under R.C. 2151.414(D)(1) that it was in the children's best interests to award LCCS permanent custody. Specifically, the court found under R.C. 2151.414(D)(1)(a) that the children had been in substitute care for most of their lives. Gregory testified that they were doing magnificently, they were well bonded to their caregiver and each other, and the caregiver was willing to adopt them. Under (D)(1)(b), the court found that the children seemed happy in their placement and their placement was meeting all of their needs. The children sought reassurance and comfort from their caregiver and were bonded with the caregiver and the other child in the home. Under (D)(1)(c), the court found that the children had been in substitute care for most of their lives. Under (D)(1)(d), the court found that a legally secure, permanent placement could not be achieved without awarding LCCS permanent custody. At the time of the hearing and for the foreseeable future, mother would not be able to provide a secure, stable, and consistent environment for the children. Mother had "made little to no appreciable progress in [her] case plan services[,]" and the GAL believed that she would

18.

not make progress even if given more time. Despite searching for relative placements, the agency could not find any appropriate relatives.

{¶ 54} After considering all of the evidence and making detailed findings, the trial court awarded permanent custody of the children to LCCS and terminated mother's parental rights.

{¶ 55} Mother now appeals, raising one assignment of error:

> The Trial Court Decision to grant Lucas County Children Service's Motion for Permanent Custody was against the Manifest Weight of the Evidence[.]

## II. Law and Analysis

### A. The law of permanent custody

{¶ 56} Revised Code 2151.414 provides the analysis that a trial court must undertake when considering whether to terminate parental rights and vest permanent custody in a children services agency. Under that section, the court must first find that one of the circumstances described in R.C. 2151.414(B)(1)(a) through (e) exists. As applicable here, subsection (a) requires the court to find that the child has not been abandoned or orphaned, has not been in the custody of a public children services agency or a private child placing agency for at least 12 months of a consecutive 22-month period, and cannot be placed with either parent within a reasonable time or should not be placed with either parent. Subsection (d) requires the court to find that the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period.

{¶ 57} If the court finds that R.C. 2151.414(B)(1)(d) applies, the court must then

19.

determine whether awarding permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1). *In re Dor.B.*, 2018-Ohio-2666, ¶ 64 (6th Dist.)

{¶ 58} If the court finds that R.C. 2151.414(B)(1)(a) applies, it must consider both whether granting permanent custody to the agency is in the child's best interest and whether any of the factors enumerated in R.C. 2151.414(E) are present that would indicate that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re B.K.*, 2010-Ohio-3329, ¶ 42-43 (6th Dist.).

{¶ 59} As relevant here, the court found that R.C. 2151.414(E)(1), (2), and (4) were applicable to mother. The statute provides:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
>
> . . .

20.

> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child[.]

R.C. 2151.414(E). The court's finding that *any* (E) factor exists is sufficient to support an award of permanent custody to the agency. *In re S.J.*, 2024-Ohio-5137, ¶ 29 (6th Dist.); *In re Carlos R.*, 2007-Ohio-6358, ¶ 38 (6th Dist.) ("[A] court need only find one factor under R.C. 2151.414(E) to support a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent . . . .").

{¶ 60} After finding that at least one factor in R.C. 2151.414(E) applies, the court must then determine whether awarding permanent custody to the agency is in the child's best interest by considering the factors in R.C. 2151.414(D)(1).

{¶ 61} All of the court's findings under R.C. 2151.414 must be by clear and convincing evidence. *In re J.S.*, 2025-Ohio-17, ¶ 34 (6th Dist.). "Clear and convincing evidence" is evidence sufficient for the trier of fact to form a firm conviction or belief that the essential statutory elements for a termination of parental rights have been established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus; *In re Tashayla S.*, 2004-Ohio-896, ¶ 14 (6th Dist.).

{¶ 62} The Ohio Supreme Court has clarified the standard of review in permanent custody cases:

> Given that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, . . . the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

21.

*In re Z.C.*, 2023-Ohio-4703, ¶ 11.  Notably, the court rejected abuse-of-discretion review in these cases.  *Id.* at ¶ 18.

{¶ 63} "The sufficiency of the evidence [standard] tests the adequacy of the evidence: a court of appeals should affirm a trial court when the evidence, if believed, is legally sufficient to support the verdict as a matter of law."  *In re C.W.*, 2025-Ohio-282, ¶ 37 (10th Dist.), citing *Z.C.* at ¶ 13.

{¶ 64} In a manifest weight review, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the decision must be reversed.  *Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.  But, while we review the evidence and consider the witnesses' credibility, we must be mindful that the trial court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony.  *In re P.W.*, 2012-Ohio-3556, ¶ 20 (6th Dist.).  If the evidence is susceptible to more than one interpretation, we are bound to interpret it in a way that is consistent with the trial court's judgment.  *Z.C.* at ¶ 14, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3 (1984).  The trial court's determination that an order of permanent custody is in the best interest of a child "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned."  (Internal quotations omitted.)  *In re C.P.*, 2009-Ohio-2760, ¶ 10 (10th Dist.).  Therefore, we will not find a permanent custody decision against the weight of the

22.

evidence if it is supported by some competent, credible evidence in the record upon which the trial court could have formed a firm belief as to all of the essential permanent custody findings. *In re I.H.*, 2020-Ohio-4853, ¶ 34 (6th Dist.).

### B. The trial court's findings under R.C. 2151.414(B)(1)(d), (E)(2), and (E)(4) support the award of permanent custody.

{¶ 65} In her assignment of error, mother argues that the trial court's finding under R.C. 2151.414(E)(1) is against the manifest weight of the evidence. Importantly, she does *not* argue that the trial court erred in making its 12-out-of-22 finding as to A.B. or its findings under R.C. 2151.414(E)(2) and (4).

{¶ 66} "'[T]he findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, [and] each is independently sufficient to use as a basis to grant the Agency's motion for permanent custody.'" (Brackets in original.) *In re A.M.*, 2015-Ohio-2740, ¶ 14 (3d Dist.), quoting *In re M.R.*, 2013-Ohio-1302, ¶ 80 (3d Dist.). "Because 'the first prong of the permanent custody test is satisfied where "one or more" of the conditions set forth in R.C. 2151.414(B)(1)(a) through (e) applies, the juvenile court's undisputed finding under [Section (B)(1)(d)] is sufficient to establish the first requirement of the statute.'" (Brackets in original.) *In re L.G.*, 2024-Ohio-4554, ¶ 44 (6th Dist.), quoting *In re R.A.*, 2022-Ohio-1748, ¶ 34 (6th Dist.).

{¶ 67} Here, the trial court made findings under both (B)(1)(a) and (B)(1)(d) as it related to A.B. Mother is challenging the trial court's (E)(1) finding, which is relevant only to the (B)(1)(a) finding. That means that mother is not disputing the trial court's finding under (B)(1)(d), which is an independent basis for awarding LCCS permanent

23.

custody of A.B. Because the trial court correctly found that A.B. had been in LCCS's temporary custody for 12 or more months out of a consecutive 22-month period, it made a (B)(1) finding that is supported by clear and convincing evidence and is not against the manifest weight of the evidence. Thus, the trial court properly awarded permanent custody of A.B. to LCCS.

{¶ 68} Regarding S.B., mother is not challenging two of the trial court's three (E) findings. R.C. 2151.414(E) directs a trial court to enter a finding that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent when it finds *any* of the enumerated factors applicable. Thus, even if the trial court erred in concluding that (E)(1) was applicable to mother, it also made findings under (E)(2) and (4)—that mother does not challenge—which is sufficient to support its conclusion that S.B. could not be placed with mother within a reasonable time or should not be placed with mother. *See In re Destiny C.*, 2008-Ohio-5292, ¶ 26 (6th Dist.) ("A proper finding of any one of the R.C. 2151.414(E) factors is sufficient to sustain a conclusion that the children cannot now, or in a reasonable time, be reunited [with the parents].").

{¶ 69} Mother's assignment of error is not well-taken.

### III. Conclusion

{¶ 70} We have thoroughly reviewed the record of proceedings in the trial court, including the trial testimony and exhibits. Because mother does not challenge the bulk of the trial court's findings—which are sufficient to support awarding permanent custody of

the children to LCCS—mother's assignment of error is without merit.

{¶ 71} Therefore, the January 30, 2026 judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.

Thomas J. Osowik, P.J.             _____

JUDGE

Christine E. Mayle, J.             

_____

Myron C. Duhart, J.              JUDGE
CONCUR.

_____

JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.